## BEARD v. BRADSHAW.

No. 18627.   Opinion Filed Jan. 7, 1930.

Commissioners' Opinion, Division No. 2.

J. T. Johnson and Mounts & Chamberlin, for plaintiff in error.

W. M. Williams, for defendant in error.

BENNETT, C.   June 30, 1925, Edna Bradshaw, who will be herein referred to as plaintiff, resided in Frederick, Okla., and was engaged in conducting a beauty parlor in four rooms of a building rented at $30 per month from J. B. Beard, Jr., who will be herein referred to as defendant.   Plaintiff occupied part of the rented space as a sleeping apartment and the balance for her business aforesaid.   She seems to have purchased an undivided one-half of the business and equipment, consisting of facial chair, hair dryer, manicure table, shampoo board, electric hair clippers, violet ray, etc., from a Mrs. J. J. Allen, with whom she conducted the business a short while; later she purchased the remaining interest and Mrs. Allen thereafter worked a short time as an employee of plaintiff.   Plaintiff paid for this business and equipment about $650.   She paid for the second one-half interest with the proceeds of a note executed by her and on which Mrs. Allen became surety for the sum of $250, payable to First National Bank of Frederick, Okla.

This is a suit by plaintiff for the value of her goods and for damages against defendant, whom she charges with the loss and conversion of same and the destruction of her business.   The issues were tried before a jury, who found for plaintiff for $500, and from judgment thereon defendant appealed.

Plaintiff alleged and offered evidence tending to show that there was a hail storm in Frederick in April, 1925, which did considerable injury to buildings in said city and damaged the building in which the plaintiff was doing business, on account of which she had to move out, and that she removed her equipment into one of the rooms which suffered the least damage.   Subsequently, she made arrangements to move to Wichita Falls, Tex., where she planned to work from June until September, when she was to return to and reopen her original quarters, which were meanwhile to be repaired.

Her plans were made known fully to defendant, who was agreeable.   Before leaving, however, she took up the matter of the $250 note with the defendant, who was the active head of the bank and the person with whom she had negotiated the loan, in order to satisfactorily arrange same.   Mrs. Allen, the surety, wished to be relieved of the obligation, and plaintiff desired an extension as to at least a part of the note. The defendant agreed that if the plaintiff would pay the note down to $100, Mrs. Allen would be released from liability thereon. Whereupon plaintiff, through the aid of her father, secured sufficient money with which to reduce the note to $100, and at that time the defendant extended the note for 90 days, which expired August 18th; she then rented a room adjoining her former quarters, but in the same building, from the defendant for $7.50 per month, within which to store her goods and equipment during her sojourn in Texas, and she and her mother placed most of the equipment in said room before she left.   After she left, her mother was to complete the storing of the goods and lock the same up.   Before leaving, the defendant requested that she have her insurance on the goods changed so as to protect the bank in the event of loss by fire, and this she did, and later delivered the policies in an envelope to the defendant, who noted in writing on the back of the envelope her street address and telephone number in

Wichita Falls. The storage room was protected by a Yale lock which could be locked but could not be unlocked without a key. Plaintiff took her key with her, but left her mother to complete the storing and locking the premises. Three days later, on July 3rd, plaintiff received information that her goods had been taken away, and returned from Wichita Falls to Frederick that evening. She, with her father, mother, and aunt, immediately went to see the defendant, Mr. Beard, and inquired as to the whereabouts of her $100 note and was told that it was in the bank. Plaintiff then asked the defendant who gave Mrs. Allen authority to take plaintiff's goods out of the building, and Mr. Beard said, "I did."

"Q. What did your father say? A. He asked him who gave Mrs. Allen the authority to take my household goods that were not mortgaged. Q. What did he say? A. My father said, 'Did you give Mrs. Allen the authority to take her household goods?' And he said, 'Yes, and I told her to take everything that was up there.'"

Plaintiff says that when she first heard her goods were taken away, she called Mr. Beard over the telephone within 30 minutes and asked him if her goods were taken away from Frederick, and he told her that they were, and that they were taken to Wichita Falls, Tex.

"Q. Where is Wichita Falls? In Oklahoma? A. No, sir; in Texas. I asked who took them, and he said Mrs. Allen. I asked who gave her authority to take them, and he said, 'I did.' Q. What tone did he use? A. Very harsh tones. Q. That all that was said? A. That is about all that was said. Q. After that was when you came up to Frederick? A. That night."

Plaintiff testified that under her arrangement with Beard, she intended to come back and would have come back and opened up for business if her goods had not been taken away; that she was unable to buy other goods; that her business had increased in volume and that her annual earnings were considerable, and that she has been unable to secure remunerative employment since her goods were taken away; that if she had been notified of any anticipated foreclosure of the mortgage, she could have borrowed the money from one of the banks at Frederick and paid up the $100; that she told Mr. Beard that if required she could pay it up by borrowing it from another. Plaintiff is asked if she knew that Mrs. Allen took her property. She answered that Mrs. Allen told her that she came up and got her property with Mr. Beard's permission. There is evidence to the effect that J. S.

Bradshaw, father of plaintiff, heard a discussion of the note between Mr. Beard and the plaintiff in which Mr. Beard promised to extend the note for 90 days. Mrs. J. S. Bradshaw, mother of plaintiff, who resides at Mangum, testified that she packed plaintiff's goods in the room; that she locked one of the two doors of the room and nailed a plank across the other. She also heard Mr. Beard say that he had given Mrs. Allen authority to take the goods away from the room; that the room was rented from Mr. Beard for the purpose of storing the goods; that when she went to the building on the 3rd of July, the doors were open and the goods were gone.

Mrs. May Allen testified by deposition that she sold plaintiff the one-half interest in the business for $250; the note was payable in three months at the bank. Said that she did not know whether plaintiff paid it or not; that she, the witness, paid it and assumed the mortgage; that "Mr. Beard told me that I would have to pay the note; Mr. Beard did not have anything to do with my taking the property except telling me to take it; he told me that I was entitled to it under the mortgage."

Mrs. Alfred Crowley and Miss Louis Brink gave testimony corroborating the testimony heretofore quoted.

The defendant introduced evidence to the effect that the rear door of the room in which the goods were kept was not locked or fastened, but remained open. This is corroborated by Carl Cassidy.

Mrs. J. J. Allen testified that the property she sold to plaintiff was worth $300 and the business $500; that Mr. Beard requested that witness pay up the note at the bank, and that she paid it and assumed the mortgage and when she paid the note, the same was turned over to her. She says the reason she took it to Wichita Falls was because she did not have money to pay storage; that when she went to get the property, the rooms were unlocked; says the exact reason "I took the property was because it was mine and I had paid for it."

Mrs. W. F. McGinnis testified that she is assistant cashier of the bank. The second or third day after plaintiff left, witness went up and discovered that the doors were open and so notified Mr. Beard of the fact, and Mr. Beard went to see about it the same day. Remembers Mr. Beard calling Mrs. Allen immediately afterwards. Does not know why Mr. Beard did not lock up the goods and keep them and take care of them.

The defendant, as a witness, testified that he remembered when the plaintiff left; that he did not own the building, but had charge of it. Plaintiff at the time she left informed witness that her business was bad, and that she could not pay the rent; said she had a position at Wichita Falls and was going there to work in the Vanity Beauty Parlor; this was the 30th of June; she put all of her property in one room. Witness had nothing to do with it. Witness was looking after the property for the owner. A day or two after she left witness saw the door open and saw the goods there in storage. Witness called Mrs. Allen at Wichita Falls, as she was surety on the note. Witness never knew she took it away. Mrs. Allen paid the note afterwards on July 11th. An exhibit from the bank's books was introduced showing the payment of the note by Mrs. Allen on July 11, 1925. Witness remembers Miss Bradshaw asking witness if Mrs. Allen had taken her goods to Wichita Falls, and witness told her that she had taken them to Wichita Falls, and witness added, "She had the note and mortgage in her possession and took charge of it. I told her that I had given her permission and did not tell her not to take it." The key to the door and policy of insurance were left at the bank in the absence of witness. Witness says he went up to look about the rooms before Mrs. Allen came. Did not lock the door because he had no key and had nothing to do with it; that he represented the bank and was relying on Mrs. Allen; took no steps to shut the door or fasten same. Did not feel that it was his duty to protect the property. Witness was agent for the landlord. Did not close the door because he had nothing to do with it. Considered Mrs. Allen good for the note. She paid the note July 11th.

For reversal defendant assigns 14 grounds of error, but many of them are abandoned. In the brief defendant's first contention is that the pleadings and entire trial and charge of the court are apparently based upon the law of bailment, and the defendant cites sections 5181 and 5182, C. O. S. 1921. Defendant in his brief says:

"Now, we believe that the allegations of the petition might be sufficient to state a cause under the above law under bailments, but we earnestly contend that there is absolutely no evidence introduced in the trial of this case which would even tend to prove a contract of bailment by plaintiff in error in regard to the property described in the petition."

We see no great merit in any refinement of reasoning in this case, for, after a very careful reading of the evidence and of the brief, we are convinced the defendant cannot, and, in good conscience, should not, prevail. The following are among the outstanding facts: The First National Bank of Frederick held a chattel mortgage for $250 on this equipment signed by the plaintiff as principal and with Mrs. Allen as surety. On the 30th of June this note was reduced to $100 by the plaintiff in order to get an extension and relieve the surety. Plaintiff then informed the defendant that she had a temporary position offered her at Wichita Falls, and that she was going to take that temporary position and wished to rent a single room adjoining the four rooms which she had formerly rented for her beauty parlor, in which to store, for the time being, her equipment; two or three days after that, the defendant discovered that the door to the room containing the equipment was unlocked, and, instead of locking the same or fastening it in some manner, he telephoned Mrs. Allen at Wichita Falls, and she came up immediately, and, by his permission and authority (if not under his direct order), she took the plaintiff's property and removed it to the state of Texas. Three or four witnesses testified unequivocally that defendant either gave or admitted giving authority for the removal of this property by Mrs. Allen, and in his own testimony the defendant says that he did that because Mrs. Allen had paid up the note and was entitled to it; that it was her property. However, the undisputed evidence is to the effect that Mrs. Allen did not pay and take up this note until July 11th—many days after the property had been removed to Texas. It is quite evident that Mrs. Allen approached the defendant for permission and authority to remove the property, and it is quite clear, as indicated above, that at that time the bank was still the holder of the unpaid note and chattel mortgage for $100. Such conduct is almost beyond understanding and partakes of the nature of bad faith if not worse.

Bailment is defined by section 5181, C. O. S. 1921, and the same may be "voluntary or involuntary; and for safekeeping or exchange." If the plaintiff's property was delivered over to the defendant for safekeeping during her temporary absence, for which plaintiff was to pay $7.50 rental on the room, with the purpose in mind that the plaintiff should return September 1st and open up her business in the repaired rooms, for which she had agreed to pay and had been paying $30 per month, there was certainly sufficient reason why the defendant

should have given at least some care to the safeguarding and protection of plaintiff's property, since the defendant was in charge of the building, the rooms in which were being leased to his customers. Hotels Statler Co. v. Safier (Ohio) 134 N. E. 460, 22 A. L. R. 1190. At any rate, if those circumstances imposed upon him the duty of giving some care and attention to the preservation of the property, the defendant became, in effect, a bailee, responsible to the plaintiff for a measure of care. It has been held by many courts that such care is required of one who finds property on the highway—one who comes, by accident or fortuitous circumstances, into possession of the property of another. Phelps v. People, 72 N. Y. 334, 358; Guaranty Trust Co. v. Diltz (Tex. Civ. App.) 91 S. W. 596. In this case the door was discovered open within a day or two after the plaintiff left. Another officer of the bank immediately notified Beard. It must be remembered, too, that a key to some part of the premises and insurance policies on these goods were left in the bank by plaintiff at the time she left, to be delivered to defendant. So that we have present an instance of where the goods of another, stored in the defendant's building for a consideration, are discovered by him to be in immediate peril of loss. We think it makes little difference whether he is or is not technically a bailee. If he had been a bailee for hire, but one duty could have attached, and that was to use reasonable care in safeguarding the property. That is the duty a bailee owes to his bailor. There is, by defendant's act, an almost explicit admission of this duty to some one, for he says he looked into the room two or three times after it was reported to be open, and then immediately called up and notified Mrs. Allen of Wichita Falls, who was not the owner of the goods, but did not call up the owner, who lived in the same city and whose address he had taken two days before.

His contention now is that he had no right to the possession of those goods, because he was not a bailee; but two days after plaintiff left, his attitude is at variance with his contention to the extent that he gave authority and permission to Mrs. Allen, who was not the owner or mortgagee of these goods, to remove all of the mortgaged property and all of the other property in the room at the same time, if this evidence is to be believed. So that, if the law does not fasten upon him the duty of a bailee, or if the contract between the parties does not fix upon him such duty, still he has, by his

own wrong, assumed the duties of a bailee (if not of actual owner), and proceeded to summarily dispose of this property by turning it over to another.

We think where one assumes the position of having authority to deal with property, and it is dealt with under that authority, to the hurt of another, that the plainest principles of common decency prevent his assertion that he had no such authority now in order to escape liability.

While we have heretofore discussed defendant's liability hereunder as if there were no evidence that he was a voluntary bailee for hire, we must not be understood to so hold. There appears in the evidence of plaintiff's mother the following:

"Q. You didn't turn that over into the possession of anybody when you left? A. No, sir, nothing, only Mr. Beard, he said he would take care of it. Q. You rented the room from Mr. Beard? A. Yes, sir."

This, in conection with the other evidence and circumstances, is sufficient to warrant the finding that this was a bailment. If, as a matter of fact, defendant was not chargeable with the duty of a bailee, then he became guilty of a conversion of this property without excuse. Again, if we should assume that the trial court instructed the jury upon the theory that the defendant was or might be found to be a bailee, even without supporting evidence, nevertheless it is our opinion that the court simply took a rather lenient view of defendant's behavior; moreover, we are satisfied from the record and the evidence that the defendant could not have been harmed thereby, for we think it clear that the jury arrived at their verdict upon the assumption that the defendant was a wrongdoer and helped and aided and abetted the conversion of this property by Mrs. Allen, and that, instead of being negligent, his conduct amounted to an affirmative and tortious disposition of this property.

The following evidence of defendant is pertinent:

"Q. You say she did make arrangements to put this stuff in one room? A. In one room. Q. You don't know whether this key she gave you belonged to that room or not? A. I don't know that. Q. That room was a room that she had been occupying? A. It was a room joining her original rooms. Q. You don't know where the key to her original room? A. No, sir. I don't know. Q. She had occupied that room some months before that? A. She had four rooms once. I think four rooms was all she ever had. Q. You say you went up a few days after she

left? A. Yes, sir. Q. She told you she was going? A. She told me she was going to Wichita Falls. * * * Q. You said you had agreed for her to put this property in one room? A. Yes, sir. * * *"

Evidence of Mrs. Allen:

"Q. Where did you take the property to after you took it? A. To Wichita Falls. Q. Did Mr. Beard have anything to do with your taking the property? A. Nothing, only just telling me to take it. Q. He told you you were entitled to it, under the mortgage? A. Absolutely."

The court charged the jury as follows:

"Now, should you find from a fair preponderance of the testimony that there was an agreement between plaintiff and defendant for the storage of plaintiff's goods and property in a room controlled by defendant; that the said goods and property was so stored and that defendant agreed to accept said goods for storage and did so accept the same for storage in a room controlled by him and that the defendant failed to use reasonable diligence and care in preserving the same and that on account of said failure to so use reasonable and ordinary diligence and care to preserve said goods, said goods or some part of the same were lost, stolen, or carried off, and plaintiff deprived of the same, or, should you find from a fair preponderance of the testimony that after said goods were stored in a room owned or controlled by the defendant, if such be the case, that Mrs. J. J. Allen, without the consent of plaintiff, entered the room where the goods were so stored and took said goods, or some part of the same, away and converted the same to her own use and benefit and deprived plaintiff thereof and should you further find that the defendant aided, abetted, or assisted the said Mrs. J. J. Allen in taking and converting said goods and property, then your verdict should be for the plaintiff and against the defendant.

"Unless you find one or the other of the foregoing propositions to be true by a fair preponderance of the testimony, then your verdict should be for the defendant."

Under this instruction, before the jury could find for the plaintiff they had to find that there was between the parties an agreement for storage; that the property was actually stored; that the defendant accepted the property for storage, and that the property was lost, stolen, or carried away because of the failure of defendant to use reasonable care in preserving the same; or that there was an agreement for storage and acceptance and delivery of possession thereof to the defendant, and that the defendant aided, abetted, and assisted one Mrs. J. J. Allen in taking and converting said goods.

It is contended by the plaintiff in error, not that the instruction upon the question of bailment was incorrect, but that the question of bailment was not involved. This question we have discussed above. However, the trial court's position might be further fortified by the rule adopted in a number of cases to the effect that the giving of an instruction which states a correct proposition of law, but which has no application to the issue involved or the proof, will not warrant a reversal of the judgment, unless it is apparent that such instruction misled the jury. C., R. I. & P. Ry. Co. v. Pruett, 67 Okla. 219, 170 Pac. 1143; Weller v. Dusky, 51 Okla. 77, 151 Pac. 606; Chickasaw Compress Co. v. Bow, 47 Okla. 576, 149 Pac. 1166; Pearson v. Yoder, 39 Okla. 105, 134 Pac. 421; Payne v. McCormick Harvesting Mach. Co., 11 Okla. 318, 66 Pac. 287.

There is not only evidence reasonably tending to support the verdict here, but it seems to us that any other jury would render a like verdict, except, perhaps, as to the amount of recovery, and it is apparent that the recovery is in no sense excessive.

The second position is that the court in instruction No. 1 gave a misleading charge to the jury, in that the court by mistake reversed the names of the parties to a certain chattel mortgage. There was but one chattel mortgage in controversy. No intelligent juror could have been misled by an error so apparent on its face. The courts are engaged in the serious business of determining rights, and a verbal inaccuracy which is apparent on its face will not be harmful. M., O. & G. Ry. Co. v. Smith, 55 Okla. 12, 155 Pac. 233.

It is also contended that this same instruction is inaccurate and prejudicial for that it instructs the jury that mere taking possession of the property by plaintiff in error, or his assigns, would make them liable for conversion. Such is not the instruction when carefully read. This instruction, when considered along with other instructions, was substantially correct, and defendant suffered no prejudice therefrom. The bank did not take possession of the property under the power in the mortgage, and no one else had the right to do so under this evidence. The claim that Mrs. Allen took the property under the mortgage is a palpable makeshift.

"The power of a mortgagee, under a clause in a chattel mortgage * * * may take possession of the mortgaged property, before the mortgage debt is due, when he deems himself insecure, cannot be arbitrarily used by the mortgagee; but must be based upon probable cause or reasonable grounds for apprehension." Wertz v. Barnard, 32 Okla. 426, 122 Pac. 649.

"While it is generally true that one, in order to be guilty of a conversion of personal property, must be in possession of it, yet, if he exercises acts of dominion over the property and participates in the wrongful act of him who is in actual possession by aiding and abetting in the wrongful disposition and sharing in the proceeds thereof, he would then be guilty of conversion." Continental Gin Co. v. DeBord, 34 Okla. 66, 123 Pac. 159.

This case seems to have been tried with care; the evidence went in practically without objection; the instructions of the court, considered as a whole, are unusually clear; the verdict seems not only well supported, but one which should logically follow the evidence in the cause, and since we find no prejudicial error, the cause is affirmed.

DIFFENDAFFER, HERR, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 3 R. C. L. p. 98; R. C. L. Perm. Supp. p. 720. See "Appeal and Error," 4 C. J. § 3014, p. 1032, n. 36. "Warehousemen," 40 Cyc. p. 483, n. 64.